**E-FILED**

Thursday, 14 September, 2006  05:07:27 PM

Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS


BENYEHUDAH WHITFIELD,

      Plaintiff,

    v.                              Case No.  04-3136

ROGER E. WALKER et al.,

      Defendants.

## Order

Before the court are the plaintiff's motions for summary judgment (d/e's 146, 152), along with several other motions.  The defendants have not filed a response to the summary judgment motions, believing that the court's stay of that response deadline was still in effect because, according to the defendants, the plaintiff has refused to answer the defendants' interrogatories as directed by the court.  (d/e's 156, 157, 176).  The defendants have moved for sanctions against the plaintiff (d/e 176).

These disputes are tangential to the court's primary inquiry at this point: is there enough evidence to give this case to a jury? After careful review of the plaintiff's submissions in support of his summary judgment motions, the court concludes that no reasonable juror could find for the plaintiff on any of his claims, except for his Eighth Amendment claims regarding a tactical team's cell extraction and subsequent strip search.

"Granting summary judgment sua sponte is permissible, although it is a hazardous procedure which warrants special caution." *The Osler Institutute v. Forde*, 333 F.3d 832, 835 (7th Cir. 2003)(citations omitted).  "When there are no issues of material fact in dispute, a district court may grant summary judgment on its own motion-as long as the losing party is given notice and an opportunity to come forward with its evidence."  *Id.*   That is the situation here.  All parties will be given an opportunity to respond.

## Summary Judgment Standard

A party moving for summary judgment must show, from the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . ." that there is no genuine issue of material fact and that the "moving party is entitled to judgment as a matter of law. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);Fed. R. Civ. P.56©.  This burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to

support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837.  A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994).

In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party.  *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992).  The question is  " . . . whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

## Undisputed Facts

The Court notes that many of the plaintiff's submissions involve claims he has already pursued in other cases.[1]  The claims in this case were set forth in the Court's merit review of December 4, 2004 (d/e 14).  Only the facts relevant to those claims are considered.

The Court finds the following facts undisputed on the plaintiff's claims in this case, from the evidence submitted by the plaintiff in support of his motions for summary judgment (d/e's 147, 148, 153, 154).

1.  At all times relevant, the plaintiff was an inmate incarcerated in the Illinois Department of Corrections, and the defendants were acting under color of state law.

2.  The plaintiff has been in the custody of IDOC since November 1996, except from around October, 1998, to August, 1999, when the plaintiff was incarcerated in Cook County Jail. (d/e 147, ¶ 2).

3.  In August, 2001, the plaintiff was incarcerated in Western Illinois Correctional Center ("Western").  (d/e 147, ¶ 3).

4.  The plaintiff maintains that, prior to August, 2001, he "had only received (approx) 5 disciplinary reports."  (d/e 147, ¶ 5)(parentheses in original).  However, the documents submitted

---

[1]For example, the plaintiff's averments about losing his job as part of the retaliation were already the subject of an earlier case, *Whitfield v. Snyder*, 03-CV-3014 (summary judgment granted to defendants).  Ditto for: placement in a cell with smokers (03-3014); disciplinary reports written by Wright, Sweetin, Bessell, Freiman, Couleas, Clark, Penwarden, Freil, Summers (03-3014);  plaintiff's hunger strike at Pinckneyville (*Whitfield v. Wexford Health Sources,* 03-CV-3113); plaintiff's suicide and crisis watch at Pinckneyville (03-3113)(03-3014); plaintiff's crisis cell conditions in Dixon (03-3014); and plaintiff's anxiety and panic attacks at Pinckneyville (03-3113).

in support of that statement do not appear to include the time period before June 1997.  (d/e 148, Ex. 4).  Additionally, the plaintiff was not in the IDOC for 11 of those months (*fact # 2 above*).

　　　5.  The plaintiff's mother and other relatives attempted to visit him around August 26, 2001.  The vehicle that the plaintiff's mother was driving was searched, and a small amount of marijuana residue was found inside a sandwich bag.  (d/e 147, ¶ 9).[2]  As a result, the plaintiff's mother was arrested and permanently barred from visiting the plaintiff.  (d/e 148, Ex. 2).

　　　6.  The plaintiff believed that the vehicle search and subsequent arrest of his mother was unconstitutional.  He informed "inmates and staff members," including Defendants Elledge and Winters, that he and his mother would be filing a lawsuit about the search and arrest.  The plaintiff filed a grievance about his mother's treatment on September 27, 2001, which was denied (d/e 148, Ex. 5).

　　　7.  On October 9, 2001, Defendant Elledge refused to allow the plaintiff to "make commissary."  (d/e 147, ¶ 19).  The plaintiff filed a grievance against Elledge on October 10, 2001, accusing Elledge of retaliation for the plaintiff's planned lawsuit about his mother's arrest.  (d/e 148, Ex. 6).  The grievance was denied as unsubstantiated.  *Id.*

　　　8.  In February, 2002, the plaintiff was transferred to Pinckneyville Correctional Center.  He remained there until April 23, 2002.  That transfer is not challenged in this case.  (Amended Complaint, Count 7, challenging transfer back to Western in 2003 and subsequent transfer to Pontiac).

　　　9.  On April 18, 2002, the plaintiff was diagnosed with a major depressive disorder.  (d/e 147, ¶ 34).[3]

　　　10.  On April 23, 2002, the plaintiff was transferred from Pinckneyville Correctional Center to Dixon Correctional Center, where he resided in a crisis cell until April 29, 2002.  (Final Pretrial Order in case 03-3014, d/e 187).  That transfer is also not challenged in this case.

　　　11.  The plaintiff asserts that he appeared before the Admissions Review Committee in May of 2002.  The plaintiff says Defendant Henry threatened to transfer the plaintiff back to Pinckneyville if he filed any more grievances or pursued his pending grievances and lawsuits, while Defendants Eubanks and Weiner sat by silently.  (d/e 147, ¶ 40).  The plaintiff disregarded Henry's threats and continued to file and pursue grievances.

---

　　　[2]According to a letter from the Warden (d/e 148, Ex. 2), marijuana was found concealed in a camera case, but the distinction is unimportant.

　　　[3]The court accepts the plaintiff's own report of his diagnosis for purposes of summary judgment.

12.  The plaintiff made an identical claim against Defendant Henry in *Whitfield v. Walker*, 02-50387 (N.D. Ill.)(*See Plaintiff's Second Amended Complaint in that case*, doc. 47, ¶ 12).  Summary judgment was granted to defendants on March 20, 2006:

> Here, plaintiff can point to no evidence of any specific negative treatment that was visited upon him in retaliation for filing any grievances. While he refers to a comment made to him by defendant Henry about a transfer to another institution, there is simply no evidence that Henry or anyone at Henry's direction ever instituted a transfer or any other negative action against him because of any motivation to retaliate for his filing grievances. Nor is there any evidence that Henry had such authority to cause a transfer. Further, plaintiff offers no evidence, beyond his own self-serving claim, that a transfer to another institution would have been negative. Therefore, the court denies plaintiff's motion for summary judgment and grants defendants' motion for summary judgment as to the retaliation claim.

(3/20/06 Court Order, PACER website, d/e 161).  The plaintiff has appealed that ruling.  *Id.*

13.  On October 11, 2002, Defendant Chattic (Dixon) wrote a disciplinary ticket against the plaintiff for intimidation/threats, insolence, and disobeying (arguing in agitated manner in response to question whether plaintiff wanted EKG).  (d/e 148, Ex. 41).  The plaintiff denied the charges. (d/e 148)(Ex. 38).  The plaintiff was found guilty of insolence, not guilty of intimidation/threats.  The plaintiff filed a grievance regarding this disciplinary report on October 30, 2002.  Defendant Lombardo filed a disciplinary report against the plaintiff arising from the same incident, which was expunged as a duplicate.  (d/e 148, Ex. 31).

14.  On October 12, 2002, Defendant Spong (Dixon) wrote the plaintiff a disciplinary report for a health/safety violation and disobeying a direct order (refused to return food tray). The plaintiff admitted that he refused to give up his food tray until his request to speak with a lieutenant about his property was honored.  The plaintiff was found guilty of disobeying.  In November, 2002, the plaintiff filed a grievance challenging the discipline.  (d/e 148, Ex. 57, 66).

15.  On November 9, 2002, Defendant Scott (Dixon) wrote the plaintiff a disciplinary report for disobeying and violating rules (failing to return shaving razor within 20 minutes). (d/e 148, Ex. 48).  The plaintiff admitted he returned the razor late, but explained that there was not enough time to shave because he had to share the sink with a cell mate.  The plaintiff was found guilty of a rule violation, not guilty of disobeying.  The plaintiff filed a grievance on the matter on December 27, 2002.  *Id.*

16.  On November 27, 2002, Defendant Gabrielson (Dixon) wrote the plaintiff a disciplinary report for intimidation/threats, insolence, unauthorized movement, and disobeying (refusing order to get in line and wait; jumping up and down and demanding to see a lieutenant) (d/e 9, p. 110-117).  The plaintiff denied the charge. The plaintiff was found guilty of insolence and disobeying, not guilty of intimidation/threats and unauthorized movement.  The plaintiff

filed a grievance about this report on December 20, 2002.  (d/e 9, p. 149).

17.  On December 3, 2002, Defendant Sanders (Dixon)  wrote the plaintiff a disciplinary report for intimidation/threats and insolence ("flipping bird" and stating "Fuck all you moose-faces" and laughing hysterically).  Plaintiff admitted to intentionally "flipping bird" to get a ticket because he was "tired of getting written up and punished for things I did not do and, second, because [I]felt this was the only way to prove that staff members are constantly harassing me . . ."  (d/e 148, d/e 64).  The plaintiff was found guilty of insolence, not guilty of intimidation/threats.

18.  On December 5, 2002, Defendant Terry (Dixon) wrote the plaintiff two disciplinary tickets arising from the same incident.  One charged the plaintiff with damage/misuse of property, intimidation/threats, insolence, unauthorized movement, and disobeying (yelling, "Fuck you bitch" "I'll slap you mother fucker," and flipping off officer).  (d/e 148, Ex. 69).  Terry's other report charged the plaintiff with unauthorized movement and disobeying a direct order (refused order to wait for escort).  (d/e 148, Ex. 92).  Plaintiff admitted to flipping off officer and saying "Fuck you," but denied threatening or intimidating anyone.  The plaintiff said he did so intentionally to prove that officers were filing trumped up charges.  *Id.*  He was found guilty on all charges.

19.  On December 8, 2002, Defendant Doering (Dixon) wrote a disciplinary ticket against the plaintiff for insolence, unauthorized movement, and disobeying (refusing to be uncuffed).  Plaintiff admitted to refusing an order, but explained that he did so to protest the fact that he had not received a mattress.  The plaintiff was found guilty of disobeying and not guilty of insolence or unauthorized movement.  (d/e 148, Ex. 40).

20.  On March 19, 2003, Defendant Morss (Dixon) wrote the plaintiff a disciplinary ticket for insolence, abuse of privileges, disobeying, and rule violations (being loud and argumentative in response to direction to wait for library clerk before entering library).  (d/e 148, Ex. 58).  Plaintiff did not defend the charges, choosing "not to give his account of what happened, since, as always, the staff members word is going to be taken over mine . . . ."  (d/e 148, Ex. 58).  He was found guilty of abuse of privileges and disobeying.  The plaintiff filed a grievance on the disciplinary report on April 2, 2003, arguing that Defendant Morss had wrongly refused the plaintiff admission to library until a library clerk arrived, because that was not normal procedure.  *Id.*

21.  On April 21, 2003, Defendant Fox (Dixon), wrote a disciplinary ticket against the plaintiff for insolence (yelling, "You don't do nothing, you don't know nothing," in response to Fox's unsatisfactory answer to plaintiff's question about state pay).  (d/e 147, Ex. 44).  The plaintiff denied the charges.  The plaintiff was found guilty, but the ticket was expunged on appeal as unsubstantiated.  The plaintiff filed grievance against Fox on April 29, 2003.  The plaintiff had earlier filed a grievance against Fox on August 6, 2002 (eight months earlier), accusing Fox of mishandling grievances (d/e 148, Ex. 57).

22.  On May 7, 2003, Defendant Greenwalt (Dixon) wrote the plaintiff a disciplinary report for disobeying and unauthorized movement (staring at Greenwalt's body, refusing to move on direct order). (d/e 148, Ex. 47).  The plaintiff filed a grievance against Greenwalt on May 25, 2003 for her report.  Greenwalt's ticket was never heard and the plaintiff was not punished.

23.  On June 25, 2003, the plaintiff received three disciplinary reports written by three different officers involving three different incidents.  Defendant Ryg (Dixon) wrote the plaintiff a disciplinary report for disobeying (refusing orders to cuff up).  Plaintiff denied refusing the order, stating that he had only asked if he could gather his legal materials before cuffing.  The plaintiff was found guilty.  He filed a grievance on the matter on July 21, 2003. (d/e 148, Ex. 57, 70).

24.  On June 25, 2003, Defendant Spong (Dixon) wrote the plaintiff a disciplinary ticket for insolence and disobeying (refusing to turn down radio).  (d/e 148, Ex. 67).  The plaintiff denied the charge.  He was found guilty of disobeying, not guilty of insolence.  The plaintiff filed a grievance against Defendant Spong about this on June 29, 2003. *Id.*

25.  On June 25, 2003, Defendant Dietterick (Dixon) wrote a disciplinary ticket against the plaintiff for intimidation/threats and disobeying (saying "Are you telling a grown man how to talk, fuck you." (d/e 148, Ex. 39).  The plaintiff admitting using curse words but not making intimidating statements.  He was found not guilty and the ticket was expunged.  The plaintiff subsequently  filed a grievance. *Id.*

26.  On July 30, 2003, Defendant Ryg (Dixon) wrote the plaintiff a disciplinary report for contraband and unauthorized property (rubberband in beard).  Plaintiff admitted to having a rubberband, but asserted that he had relinquished it on command, and also maintained that he had not received adequate notice of the report.  The plaintiff was found guilty.  (d/e 148, Ex. 71)

27. On August 5, 2003, Defendant Sefrhans (Dixon) wrote the plaintiff a disciplinary report for insolence (saying "I don't give a shit" in response to conversation with Sefrhans about copies).  (d/e 9, p. 143-147).  The plaintiff admitted making the remark but maintained he was responding out of frustration to Sefrhan's threat to tear up his copies.  The plaintiff was found guilty.  The plaintiff filed a grievance against Sefrhans on February 11, 2003 based on her report. (d/e 9, p, 157).

28.  On August 12, 2003, Defendant Harvey (Dixon) wrote the plaintiff a disciplinary report for disobeying (not complying with chow line movement).  The plaintiff was found not guilty and the ticket was expunged as unsubstantiated.

29.  On September 17, 2003, the plaintiff was transferred from Dixon to Western.

30.  On September 17, 2003, Defendant Hamilton wrote a disciplinary report against the plaintiff for intimidation and threats , accusing the plaintiff of refusing his lunch on the transfer

bus to Western, throwing his lunch on the floor, and stating something to the effect that, "Nobody is going to tell me what to do." (d/e 148, Ex. 9). In his defense, the plaintiff admitted allowing his lunch placed on his lap to drop to the floor, but only because he had already refused it on religious grounds and had decided to start his hunger strike on the bus. *Id.* On September 24, 2003, the plaintiff was found guilty and received punishment of six months grade demotion, six months segregation. *Id.*

31. On September 18, 2003, Defendant Thomas (Western) wrote the plaintiff a disciplinary report for intimidation/threats and disobeying a direct order. Thomas accused the plaintiff of refusing to cuff up and of retorting, "Fuck you bitch, I'm not going anywhere" and "Come in here and get me, I'll kill one of you motherfuckers." (d/e 148, Ex. 10). In his defense, the plaintiff did not admit to the language, but did admit to initially refusing to cuff up because of exhaustion, lack of sleep and confusion. The plaintiff maintained that he had complied fully by the time the tactical team arrived, standing with his hands behind his back. On September 24, 2003, the plaintiff was found guilty on this disciplinary ticket and lost six months of good time credit, received six months segregation, along with other punishments. *Id.*[4]

32. The plaintiff asserts that the tactical team used excessive force when they extracted him from his cell on September 18, 2003. He avers that, by the time the tactical team arrived, he was fully compliant, with his back to the cell door and hands behind his back, ready to cuff up and to be transferred.

33. On September 18, 2003, the plaintiff was submitted for a disciplinary transfer to Pontiac as a result of Thomas' disciplinary report. The transfer justification reads, "Inmate Whitfield is being submitted for a transfer to Pontiac CC. He is receiving an IDR for DDO and Intimidation and threats. Offender refused to come out of his cell to be fingerprinted . . . Tac Team had to be activated to extract offender . . ." (d/e 9, p. 173). The plaintiff was transferred to Pontiac.

34. On May 1, 2004, Defendant Bohm (Pontiac) wrote the plaintiff a disciplinary report for Damage/Misuse of Property ("line" made out of a state bedsheet coming out of plaintiff's cell). (d/e 148, Ex. 53, 55). The plaintiff admitted using his t-shirt (not a bed sheet) as a retrieval device for a kite that another inmate had sent him. The plaintiff was found guilty. He filed a grievance on the matter on May 13, 2004.

## Application of Law to Facts

---

[4]The plaintiff's challenge to the validity of this disciplinary report cannot be brought under 42 U.S.C. Section 1983 because he lost good time.

I.  Count 1:  Retaliation with False Disciplinary Charges:

"The federal courts have long recognized a prisoner's right to seek administrative or judicial remedy of conditions of confinement, . . . as well as the right to be free from retaliation for exercising this right." *Babcock v. White*, 102 F.3d 267, 276 (7th Cir. 1996)(citations omitted). "To succeed on a retaliation claim, the plaintiff must "establish that his protected conduct was a motivating factor behind [the defendants' actions], . . . . [T]he ultimate question is whether events would have transpired differently absent the retaliatory motive . . ." *Id.* at 275.

The plaintiff maintains that the disciplinary reports were false, in retaliation for his protected first amendment activities spanning back to his protest in 2001 over his mother's arrest, the grievances and lawsuits he has filed throughout his incarceration, and his oral complaints to officers.

The plaintiff's evidence is: 1) the grievances and lawsuits he has filed over the years; and, 2) the disciplinary reports and disciplinary punishments he has  received over the years. The plaintiff relies on an argument akin to *res ipsa loquitur*– i.e., the mere co-existence of grievances, lawsuits and disciplinary reports allows an inference of retaliatory motive.  If that were so, every disciplinary report written against an inmate with a history of filing grievances and lawsuits  would automatically allow an inference of retaliatory motive.

It is undisputed that the plaintiff has filed grievances and lawsuits and has received disciplinary reports and discipline.  What is missing is any evidence of that the former motivated the latter.  The reports were written by eighteen different officers over two years, all involving different incidents, many of which were admitted to by the plaintiff.[5]  Most of the grievances the plaintiff wrote against an officer were filed *after* that officer's disciplinary report.  The plaintiff's theory of the case is that, each time an officer wrote a disciplinary report against him, that officer became part of the retaliation conspiracy against the plaintiff for all the plaintiff's prior grievances and lawsuits.  That theory was enough to survive notice pleading but remains an unproven theory at the summary judgment stage.  Accordingly, summary judgment must be granted on Count 1.

Count 2: Retaliation by Guilty Findings on Disciplinary Reports

As with the writing of the disciplinary reports, there is no evidence that the defendants who handled those reports acted out of  retaliatory motive.  Accordingly, summary judgment must be granted on Count 2.

_____

[5]The court notes that the plaintiff admitted to the conduct charged in the following disciplinary reports: 10/12/02 (Spong); 11/9/02 (Scott); 12/3/02 (Sanders); 12/5/02 (Terry); 12/8/02 (Doering); 3/19/03 (Morss)(no contest); 7/30/03 (Ryg); 8/5/03 (Sefrhans); 9/17/03 (Hamilton).

Count 3:  Retaliation by denying the plaintiff access to legal materials and other harassment

The plaintiff alleges that he filed a grievance against Defendant Sefrhans on October 30, 2002, and then experienced a hostile, confrontational attitude from her, along with a false disciplinary report.  However, the grievance he references (d/e 148, Ex. 100) was filed *after* Sefrhans' disciplinary report against the plaintiff, not before.  And, as discussed above, there is no evidence that Sefrhans filed her report out of retaliation or that it was false–the plaintiff admitted making the insolent remark.  A hostile attitude cannot be the basis of a constitutional retaliation claim, and things Sefrhans did or said outside the time frame of this lawsuit also cannot form the basis for a retaliation claim here.  *See* d/e 153, p.3 and Exhibit 101 attached.  As there is no claim against Sefrhans, there can be no claim against her supervisor Gaffy.  Accordingly, summary judgment must be granted on Count III.

Counts 4 and 15: Tactical Team Cell Extraction and Strip Search on September 18, 2003

This claim arises from the tactical team cell extraction on September 18, 2003.  The plaintiff lost good time as a result of a disciplinary ticket written by Defendant Thomas, charging the plaintiff with refusing to cuff up.  *(Undisputed Fact # 30 above).*  The plaintiff denied threatening anyone and insisted he only refused to cuff up initially because he was in a semi-conscious state. (d/e 153, p.6).

The plaintiff's challenge to Thomas' disciplinary report and subsequent punishment is barred by *Heck* because the plaintiff lost good time.  If Thomas' report was false, the plaintiff should never have lost good time.[6]  *Moran v. Sondalle*, 218 F.3d 647, 650 (7th Cir. 2000)(prisoners who want to challenge "administrative orders revoking good-time credits or equivalent sentence-shortening devices, must seek habeas corpus, because they contest the fact or duration of custody.")(citations omitted).

However, the disciplinary report and punishment did not involve the extraction, only the events leading up to the extraction.  The plaintiff asserts that the tactical team used excessive force to extract him.  Particularly, he says that he was fully compliant by the time the tactical team arrived.  He asserts that the team sprayed him unnecessarily with pepper spray, intentionally did not adequately rinse off the pepper spray, and punched and kicked him.  (d/e 153, p. 5).  The team then allegedly conducted a strip search of the plaintiff in full view of many officers whose presence was unnecessary.  *Id.* at 56.  The plaintiff's account raises an inference of Eighth Amendment violations, and there is no opposing evidence from the defendants.

---

[6]As already discussed, the plaintiff admitted to initially refusing to cuff up, so the report was not false in any event.  And, also as discussed, there is no evidence the report was motivated by retaliation for the plaintiff's protected First Amendment activities.

Accordingly, these claims will be set for trial.[7]

        Count 5: Failure to Rinse Pepper Spray by Unknown Transporting Officers

        The plaintiff alleges in this count that, after the cell extraction and strip search, two
unknown officers who were transporting the plaintiff to Pontiac, refused to flush the plaintiff's
eyes and skin with water and exacerbated the plaintiff's skin and eye burning by increasing the
temperature inside the transport van.  These officers have not been identified and served and thus
are not in the case.  Summary judgment is mandated on this claim for the existing defendants
because they cannot be held responsible for these officers' actions.   (d/e 153, p. 11, n. 12;
Amended Complaint, Count 5, claim against  two unknown officers).

        Count 6:  Disciplinary Confinement & Failure to Provide Breakfast or Lunch for Three
Days:

        In support of this claim, the plaintiff points to a grievance he filed on January 30, 2004,
which challenged a cell transfer and accused Smithson of serving regular food trays, despite
knowing that the plaintiff was supposed to receive a special diet.  The grievance response
indicates that Smithson acknowledged that the plaintiff had not received "a couple of dietary
trays until dietary became aware of the cell transfer."  (d/e 148, Ex. 60).

        This grievance does not support an inference that the plaintiff was denied the minimal
necessities of life within the meaning of the Eighth Amendment.  The plaintiff's hunger came
from his own choice to decline the regular food tray (presumably for religious reasons),
according to his own grievance.  There is also no evidence that the temporary failure to provide
the plaintiff with his special diet trays was motivated by retaliation for his protected First
Amendment activities.

        Count 7:  Retaliatory Transfers to Western (9/17/03) and Pontiac (after 9/18/03 incident):


        The plaintiff argues that these transfers resulted from the false disciplinary tickets that
were issued in retaliation.  A court has already ruled against the plaintiff on his retaliatory
transfer claim from Dixon to Western, *see Undisputed Fact # 11, above,* and his transfer from
Western to Pontiac was because of Thomas' disciplinary report, to which the plaintiff partially
admitted.  In any event, there is no evidence that the transfers were motivated by retaliation.
Accordingly, summary judgment for the defendants is mandated on this claim.

        Count 8:  Failure to Provide Mattress:

        The plaintiff maintains that defendants Brinkmeir, Howell and Bonnet denied his

_____

        [7]A video of the extraction apparently exists, but is not in the record.

                                10

requests for a mattress from 4:30 p.m. on December 7, 2002, until 9:00 a.m. the next morning. (d/e 153, p. 29).  The plaintiff was unable to sleep on the cold, steel bunk.

Although not laudable, the Court does not believe denial of a mattress for one night rises to the level of an Eighth Amendment violation.  The plaintiff received a mattress the next day. (d/e 147 Ex. 40).  Nor is there any evidence that the denial was in retaliation for any of the plaintiff's protected First Amendment Activities.  Accordingly, summary judgment is mandated on this claim.

Count 9:  Retaliation by Destroying the Plaintiff's Property:

The plaintiff maintains that, on August 29, 2003, Defendants Burges and Diaz took all of the plaintiff's food items pursuant to a shakedown, while other inmates were allowed to keep some of their food.  The plaintiff says this was in retaliation for his grievance, but the grievance he points to is dated *after* the food confiscation and was in fact about that confiscation.  (d/e 147, Ex. 34).  Thus, no inference of retaliatory motive arises.

The plaintiff also asserts that, on October 11, 2002, Defendant Perry tried to force him to sign an excess property inventory receipt which would have forced him to send his property home or have it destroyed.  (d/e 148, Ex. 62, 63, property inventory record).  When the plaintiff refused, Perry refused to permit him to have the property in segregation.  The plaintiff believes this amounted to retaliation because he had filed a lawsuit against officials at Dixon eight days earlier.  This is not evidence that Perry's actions were motivated by retaliation–it is speculation and conjecture that Perry was even aware of such a lawsuit or was motivated because of it. Summary judgment is accordingly mandated for the defendants on this claim.

The plaintiff alleges in his summary judgment motion that Defendant Neal confiscated the plaintiff's food, after the plaintiff orally complained about Neal's unsanitary methods of handling food, and that Neal shook the plaintiff's cell down "whenever the plaintiff was out of his cell."  (d/e 153, p. 36).  The plaintiff's allegations against Neal in his summary judgment motion were not a part of this Count and are not a part of this case. (see Amended Complaint, Count #9, claims against Burges, Diaz, Perry).  These are new allegations and discovery is closed–this claim is not part of the case.

Count 10:  Retaliation by Refusing to Allow the Plaintiff to Visit his Brother (an  inmate incarcerated in the same prison as the plaintiff )

The plaintiff has no evidence that the handling of his request to visit his brother (an inmate incarcerated at Dixon while the plaintiff was incarcerated there) was motivated by retaliation.  His grievance shows only that his request was not dealt with as expeditiously as he desired.  He was eventually permitted to visit with his brother (d/e 148, Ex. 36).  The plaintiff concedes that similarly situated inmates were treated like him (d/e 153, p. 38).  No inference of retaliatory motive exists, so summary judgment is mandated for the defendants on this claim.

Count 11:  Retaliation by Intentionally Mishandling or Denying Grievances

The plaintiff points to his grievance of August 6, 2002 (d/e 148, Ex. 57) as evidence that his grievances were mishandled.  But the August 6th grievance complains only that the grievances were not being handled as quickly as the plaintiff believed they ought to be:  the plaintiff was asking for a response to a grievance he had filed July 25, 2002, and stated that he had not believed his counselor's response that the rules allowed 30 days to answer a grievance. The plaintiff's letters he points to in support of this claim (dated 1/20/03 and 3/9/03) complain of five grievances to which the plaintiff had not received an answer.  Five missing grievances out of the many grievances that the plaintiff filed does not allow an inference of intentionally, systemic mishandling  The bulk of grievances submitted by the plaintiff show that they were responded to. In any event, there is no evidence that retaliation was behind how any grievances were handled, including the five complained of in the letters.

Count 12: "Aiding and Abetting" the filing of false/unjustified disciplinary reports in Retaliation for Protected First Amendment Activities

As with counts 1 and 2, there is no evidence that the defendants who handled the disciplinary reports acted out of  retaliatory motive.  Accordingly, summary judgment must be granted on this count.

Count 13:  Refusing to Allow the plaintiff to go to Commissary:

The plaintiff alleges that defendants Ellege and Burges retaliated against the plaintiff by making racist comments to him and refusing to allow him to go to commissary. There is no evidence that Ellege's one-time denial of commissary was motivated by retaliation.  The plaintiff's grievance against Ellege came after and was about that denial of commissary.  The plaintiff says he told Ellege about his plan to file a lawsuit challenging the arrest of the plaintiff's mother, but that is not enough to allow an inference of retaliatory motive.  Ellege had nothing to do with that search and arrest.  *See* d/e 148, Ex. 2 (Hockaday, Winters); Ex. 5 (Crum, Vincent, Barr, Hockaday).

Count 14:  Retaliation by stealing and tampering with mail

The plaintiff points to a United States Postal Tracking record that shows two unidentified items he mailed were not found.  (d/e 153, p. 50; d/e 147, Ex. 21).  This document does not support the allegation in this count that Defendant Meyer and other unknown Dixon Correctional Center employees stole and/or tampered with the plaintiff's mail, much less that they did so in retaliation for exercising his First Amendment right.  The document shows only that the item numbers were not "found" by the United States Postal Service.  Many of the plaintiff's grievances he points to as evidence involve Pontiac, not Dixon.  The grievances also concern events outside the time frame of this action or officers who are not defendants here: one incident of alleged missing pages from a communication from the Attorney General; an improper opening of mail by a correctional officer Schroeder/Shrader who is not a defendant here; a grievance

against Meyer filed April 1, 2005, beyond the time frame of this case, that accused Meyer of opening one piece of legal mail; and grievances in 2005 regarding Lawrence Correctional Center. (d/e 147, Ex. 73-83). In short, there is no evidence to support the plaintiff's claim that Defendant Meyer intentionally interfered with the plaintiff's mail or that Meyer took any actions out of retaliation. Summary judgment is therefore mandated on this claim.

### Trial by Video Conference

The court acknowledges that the "decision to deny a prisoner the opportunity to be physically present at a civil rights trial he initiates is not one that should be taken lightly." *Thornton v. Snyder*, 428 F.3d 690, 697-699 (7th Cir. 2005)(discussing trial by video and affirming this court's decision to hold trial by video under abuse of discretion standard). Here, however, considerations of security, time and expense weigh heavily in favor of holding the trial on the plaintiff's remaining claims by video conference.

The claims remaining are relatively simple. They are the plaintiff's Eighth Amendment claims arising from the tactical team's cell extraction on September 18, 2003, and subsequent strip search. *See Counts 4 and 15 above.* These claims are against Defendants Baker, Melvin,[8] Mitchell, Pritchard, Ruiz and Winters. The evidence will consist largely of the testimony of these seven people-the plaintiff and defendants--plus the videotape of the extraction (if it exists). The plaintiff is now incarcerated in Lawrence Correctional Center, about 130 miles from the courthouse. Lawrence is equipped with video-conferencing equipment, so the plaintiff would not have to be transported anywhere if the trial were held by video.

More important are the security concerns. In the plaintiff's trial before this court last February, the plaintiff was argumentative and belligerent with the U.S. Marshals while they had custody of him in the courthouse, and was argumentative and belligerent with the court during his case. *Whitfield v. Snyder et al.*, 03-3014. The plaintiff had difficulty following this court's rulings during trial and required frequent admonishment not to argue with the court's rulings and to stay on track with the claims in the case. The court respects the plaintiff's right to present his case, but the court believes it prudent to avoid the risk of a repeat performance. Video conferencing will reduce these risks and difficulties significantly because the Marshals will not have to be involved with the plaintiff's custody and the plaintiff will not have to be transported outside his current prison.

As the defendants already know, the court requires all the parties, witnesses and attorneys to appear by video for the trial, not just the plaintiff. This ensures equal footing for each party's presentation. *Lemmons v. Skidmore*, 985 F.2d 354, 357 (7th Cir. 1993)("There is a constitutional right to a fair trial in a civil case. It is difficult, but essential to maintain this right for prisoner-plaintiffs."). The jury, judge and court reporter will be in the courtroom. The interactive video conferencing will be conducted with a split screen that will enable the participants to see each

---

[8]Melvin is being dismissed pursuant to Fed. R. Civ. P. 4(m).

and hear each other simultaneously. The plaintiff and defendant will have an opportunity to see and question each potential juror, to present any witnesses or evidence, to cross examine witnesses, and to argue to the jury. Each party will be able to respond and react to developing testimony or facts, and will be able to observe the jury's reactions.

IT IS THEREFORE ORDERED:

1)    The plaintiff's summary judgment motions are denied (d/e's 146, 152).

2)    The plaintiff's motion for reconsideration is denied (d/e 160).

3)    The plaintiff's motion to compel is granted to the extent he seeks a copy of the video tape of the extraction, if the tape exists and has not already been produced (d/e 161).  The defendants are directed to produce the tape within 14 days of this order and also directed to produce a copy to this court.

4)    The plaintiff's motion for sanctions is denied (164).

5)    The plaintiff's motion for leave to file is denied as moot (d/e 166).

6)    The plaintiff's motion for an extension is denied (173)–there was no response deadline pending when he filed the motion.

7)    The plaintiff's motion to expedite is denied (d/e 174).

8)     The defendants' motion for sanctions is denied (d/e 176).

9)    Defendants Melvin and White are dismissed pursuant to Fed. R. Civ. P. 4(m).

10)   Sua sponte, the court moves for summary judgment in favor of the defendants on all of the plaintiff's claims, except his Eighth Amendment claims arising from the tactical team's cell extraction on September 18, 3003 and subsequent strip search. The only defendants implicated in those Eighth Amendment claims are: Defendants Baker, Mitchell, Pritchard, Ruiz and Winters.

11)   The plaintiff shall have 30 days to file a response to the court's summary judgment motion, coming forth with evidence (not already submitted) to show a justiciable question of fact exists.  The defendants shall have 14 days thereafter to file their reply, if any.

12)   A final pretrial conference is scheduled for March 6, 2007, at 1:30 p.m. by video conference.  The proposed final pretrial order is due by March 1, 2007, and must include the locations from which the parties, attorneys and witnesses will appear by video, to enable the clerk to issue the necessary video writs.

13)     By March 1, 2007, all parties shall file with the Court all exhibits intended to be introduced at trial.

14)     A jury trial is scheduled for April 12, 2007, at 9:00 a.m., by video conference.


Entered this 14th Day of September, 2006.

                                              **s\Harold A. Baker**
                                         _____
                                              HAROLD A. BAKER
                                         UNITED STATES DISTRICT JUDGE