UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

BENYEHUDAH WHITFIELD,

    Plaintiff,

v.                                         Case No. 04-3136

ROGER E. WALKER et al.,

    Defendants.

**Order**

On February 23, 2007, summary judgment was entered in favor of Defendants on all of Plaintiff's claims, except for his Eighth Amendment claims arising from a tactical team's ("tact team") cell extraction on September 18, 2003 and subsequent strip search. For the reasons below, the court grants summary judgment on that claim as well, terminating this case.

**Summary Judgment Standard**

A party moving for summary judgment must show, from the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . ." that there is no genuine issue of material fact and that the "moving party is entitled to judgment as a matter of law. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);Fed. R. Civ. P.56(c). This burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837. A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994).

In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). The question is " . . . whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

## Undisputed Facts[1]

1. Plaintiff was incarcerated at Western Illinois Correctional Center on September 18, 2003. That morning, Correctional Officer Thomas came to Plaintiff's cell and directed Plaintiff to come to the door of his cell to be restrained so that Plaintiff could be taken to the "B of I" (Bureau of Identification).

2. According to a disciplinary report later written by Officer Thomas, Plaintiff replied "Fuck you, Bitch, I'm not going anywhere." Officer Thomas then gave Plaintiff a direct order to cuff up, but Plaintiff refused and said, "Come in here and get me. I'll kill one of you, motherfuckers." Officer Thomas then left, presumably to call in the tact team. Later that day (September 18, 2003), Officer Thomas wrote Plaintiff a disciplinary ticket based on the incident, charging Plaintiff with intimidation and threats and refusing a direct order. The Adjustment Committee found Plaintiff guilty of both based on Thomas' description of the incident. (d/e 231, Ex. 3; Ex. 4 (ARB decision)). The Committee recommended Plaintiff receive a revocation of six months good conduct credit. Plaintiff was also transferred to a higher security prison, received six months of segregation , 6 months C grade and 3 months loss of privileges. (d/e 235, p. 5, para. 1). The Warden or his designee signed off on the recommendation. Plaintiff had a hearing by video before the Administrative Review Board on November 13, 2003; the Board upheld the punishment. (Exhibit 4).

3. Plaintiff describes the tact team cell extraction and strip search on September 18, 2003, as follows:

> After I was returned to my cell [on the morning of September 18, 2003], I fell asleep and was awaken [sic] by (who has been identified as) Defendant Thomas, who advised me that he was there to take me to B of I and to come to the door so I could cuff up. However, due to the [fact] that I was extremely exhausted and not fully conscious of what was going on, although somewhat awaken, I failed to comply with Defendant Thomas's order, but I never made any threatening statements.[2] After Defendant Thomas left, I did become fully conscious and realized that I had refused to comply with the orders . . , and I immediately got out of bed, got dressed and waited, hoping he would return so I could explain myself, however, a tact team member came to my door instead, with a vidio [sic] recorder and pointed it at me. I told the tact team member that a mistake had been made and that I was ready to comply to cuff up and be taken to B of I. . . . I made repeated requests to open my chuck hole so I could cuff up . . . When I saw that the tact team was about to come in and they used the pepper spray, I turned my

---

[1]Taken essentially verbatim from Defendants' facts, to the extent material, supported by the record, and undisputed by Plaintiff.

[2]Plaintiff now says he does not dispute Thomas' account.

back to them (or away from the door) and took a few steps towards the front of my cell and put my hands behind my head and got down on my knees. The tact team bust[ed] into my cell, started hitting and kicking me, as I layed [sic] on the floor. As I layed on the floor, being hit, someone was using some sort of object (or perhaps their [k]nuckle) to apply pressure to the back base of my skull that was absolutely excruciating. Throughout the entire incident, I never resisted in any way. I was then taken to an open[3] area and placed in a holding cell . . . I was ordered to remove all my clothes and to comply with a strip search, which included a visual of my anal cavity and groin area. During the entire strip search, the entire tact team was present, along with the attending (female) nurse, Defendant(s) Melvin, Mitchell, Pritchard, Ruiz (another female staff) and several other correctional staff members; all of whom just stood and watched as I complied with the strip search. Prior to being placed in the holding cell, where I was forced to comply with the strip search, I was taken to a janitor's closet where one of the tact team members used a water hose to pretend as if he was rinsing my face, but, although water did come in contact with my face, the water was shooting up my nose, and I felt as if I was drowning. I was not permitted to rinse the rest of my body or have it rinsed. After the strip search, I was given another jump suit, was hand-cuffed and shackled again and taken to the B of I, where I was fingerprinted and took a mug shot. Shortly afterwards, I was placed in a transfer vehical [sic] and transported to the Pontiac Correctional Center.[4] (d/e 147, pp. 56-58).

4. C/O Mike Knisley was a member of the tact team that extracted Plaintiff from his cell on September 18, 2003. (Knisley Affidavit)[5]. Knisley took the videotape of the incident.

5. C/O Knisley reviewed the videotape at the request of the Attorney General's Office. (Knisley Affidavit).

6. C/O Knisley began filming before the tactical team made it to Plaintiff's cell, but turned the camera off and repositioned himself when the team arrived to get a better view of the incident. (Knisley Affidavit).

7. The filming began prior to the cell door being opened. (Knisley Affidavit).

8. The film accurately depicts the entire incident up until the time Plaintiff was screened

---

[3]Plaintiff may have crossed out "open" but it is not clear.

[4]Plaintiff's claims regarding his treatment during transport were dismissed in an earlier order.

[5]Plaintiff disputes Knisley's affidavit based on insufficient knowledge, but Plaintiff's insufficient knowledge does not put the fact in dispute.

by the health care unit nurse and his eyes flushed. (Knisley Affidavit). Video operators are trained to turn off the camera during medical screening and procedures for privacy reasons. (Knisley Affidavit).

    9. After the nurse completed her examination, the camera was turned back on. (Knisley Affidavit).

    10. C/O Knisley saw the nursing staff check Plaintiff again after he was inside the holding cell and turned off the camera again during this examination. (Knisley Affidavit). Plaintiff counters that the nurse did not examine him but only gave a "frontal visual which lasted no more than 10 seconds." (d/e 235, p. 9, para. 7).

    11. After Plaintiff was again checked by the nurse, the camera was turned back on until the incident was over and C/O Knisley was ordered to turn it off. (Knisley Affidavit). Plaintiff asserts the incident was not over, because the video does not capture the taking of Plaintiff's mug shot (he asserts he could still not open his eyes because of the pepper spray), nor his movement to the transport vehicle. (d/e 235, p. 12, para. 12).

    12. Lt. Bryon Law was present at the cell extraction of September 18, 2003. (Law Affidavit and attachments). According to incident reports, the other members of the extraction team were C/O Jennings; Sgt. Huddleston; Sgt. Conley, C/O Knisley (video operator), C/O Clayton (commander); and Lt. Law. (Law affidavit and attachments).

    13. The tactical team is activated after an offender refuses repeated orders to cuff up. (Law Affidavit and attachments). The team dresses in orange jump suits and protective gear, including helmets and body padding. (Law Affidavit and attachments). The gear is necessary, as many offenders physically resist the tactical team and sometimes utilize weapons. (Law Affidavit and attachments). Any resistance by the person being extracted could cause injury to both the offender and the team performing the extraction. (Law Affidavit and attachments).

    14. A determination of which member of the team will perform which task is made before the team deploys to the cell. (Law Affidavit and attachments).

    15. A video is usually made of the extraction. (Law Affidavit and attachments).

    16. Chemical agent was deployed pursuant to protocol to ensure Plaintiff cooperated with the team. (Law Affidavit and attachments). Plaintiff counters that no chemical agent was necessary because he was fully compliant and had consented to cuffing up by the time the tact team arrived.

    17. Strip searches are performed to ensure that an offender is free of contraband, i.e. weapons, drugs, cuff keys, etc. (Law Affidavit and attachments).

18. The offender is placed in the holding cell for the search to ensure containing of the offender as well as security for the staff conducting the search should the offender try to attack. (Law Affidavit and attachments).

19. Plaintiff was examined by a physician at approximately 5 p.m. the same day of the extraction. According to the medical records, Plaintiff complained he had been "beat up," but the doctor's observation was that Plaintiff was in no acute distress, had no abrasions, erythema [skin inflammation] or swelling. The medical records reflect that Plaintiff had full hand grasps and normal alignment of wrists and back. (Exhibit 5). Plaintiff counters that his wrists were swollen, that he suffered injuries to his back and head, and that his "right thumb [was] injured so bad the he had trouble grasping. In fact, a remnant of the injury is still visible" (d/e 235, p. 18, para. 27; p. 21, para. 11 ).

*Analysis*

Plaintiff does not dispute that the officers involved in the cell extraction were correctional officers Jennings, Huddleston, Conley, Knisley (video operator), Clayton (commander), and Lt. Law. None of these officers are defendants. Plaintiff asserts vaguely that, "When Defendants Baker, Mitchell, Pritchard, Ruiz and Winters first became aware of the actions of the tactical, they all had an obligation to 'rectify the offending condition' [citation omitted], but (instead) they just stood by, and, if not took part in directing the conduct, the permitted it to take place without any protest." (d/e 235, p. 29). Plaintiff's vague assertion is insufficient to hold these Defendants responsible for the actions of others. "On a number of occasions we have specifically held that in order for liability to attach under § 1983, 'an individual must have personally caused or participated in the alleged constitutional deprivation.'" *Harper v. Albert*, 400 F.3d 1052, 1062 (7th Cir. 2005)(citations omitted). The record does not allow an inference of personal responsibility against the named defendants.

In any event, the evidence in the record does not support an inference that Plaintiff's constitutional rights were violated. "In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation, . . ." *Harper*, 400 F.3d at 1064 (citation omitted). No reasonable juror could find Plaintiff's Eighth Amendment rights were violated by the cell extraction and strip search.

The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain." *See Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). Excessive force is force applied "maliciously and sadistically to cause harm," as opposed to force applied "in a good-faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 5. Relevant factors include the need for force, the relationship between that need and the force applied, the threat reasonably perceived by the officers, the efforts made to temper the severity of the force employed, and the extent of the prisoner's injury. *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 2000), *citing Hudson*, 503 U.S. at 7. "[W]hile significant injury is not required, a claim ordinarily cannot be predicated upon a de minimis use of force." DeWalt, 224 F.3d at 619; *see also Outlaw v. Newkirk*, 259 F.3d 833, 839 (7th Cir. 2001)(minor injury from guard shutting

cuffport door on inmate's hand dismissed on summary judgment for guard). "[T]he quantum of force required for a constitutional violation is that which is 'repugnant to the conscience of mankind.'" *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004), *quoting Hudson*, 503 U.S. at 10 (other cite omitted). "[I]n order to survive a motion for summary judgment, the prisoner must have evidence that 'will support a reliable inference of wantonness in the infliction of pain.'" *Id.*

Plaintiff concedes to Thomas' account of Plaintiff's refusal to cuff up and threats. (d/e 235, p. 24)("Plaintiff is not challenging the conviction which resulted from the disciplinary report filed by C/O Thomas."). According to Thomas, Plaintiff refused direct orders to cuff up, instead responding, "Fuck you, Bitch, I'm not going anywhere," and, "Come in here and get me. I'll kill one of you, motherfuckers."[6]

The officers acted reasonably by taking Plaintiff's refusal and threats to Thomas seriously. The fact that Plaintiff professed a change of heart when the tact team arrived does not matter.[7] How were officers to know if Plaintiff's belated agreement to cuff up was sincere or a trick? Plaintiff's statements to Thomas were a serious challenge to prison officials' authority and a serious threat to correctional officers' safety. Prisons are volatile settings; prison guards can and do get killed. To allow a jury to second-guess the tact team's actions here would obviate the deference that must be accorded them. *See Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005)("high degree of deference to the discretion of prison administration to 'adopt policies and practices to maintain the safety and security of this country's penitentiaries.'")(citation omitted).

Further, in the court's opinion, the video leaves no doubt that the extraction was conducted "in a good-faith effort to maintain or restore discipline, " not "maliciously and sadistically to cause harm." *See Scott v. Harris*, 127 S.Ct. 1769 (2007)(facts on summary judgment must be viewed in light of videotape that recorded incident). A short burst of pepper spray was given through the bottom opening of the door. Officers then waited a few moments, opened the door, entered, and surrounded Plaintiff. The officers' movements are measured and calm as they surround him, they do not hit or kick, they are all visible. Plaintiff counters that he was beat about the head during 2-3 seconds that the video does not show because of the angle of the camera. After viewing the video, the court does not see how this is possible, but in any event as Plaintiff was brought to a standing position, it is evident on the video that Plaintiff is in no apparent physical distress, his eyes open. *See Fillmore*, 358 f.3d at 504 (acknowledging that video did not "capture every second" but was "fairly comprehensive" and showed only "incidental bumping" and the plaintiff not in apparent discomfort). There is a time when the video cuts out, but Plaintiff does not dispute that he was being seen by a nurse at that time.

---

[6] If Plaintiff *is* challenging Thomas' account, his excessive force claim would be barred by *Heck*, because it was Plaintiff's statements to Thomas that necessitated the tact team's extraction.

[7] Plaintiff does shout several times through the cell door, "I'm cuffing up, I'm cuffing up, what else to you want me to do?"

6

When it cuts back in Plaintiff is handing his clothes through the holding cage to an officer, again Plaintiff in no apparent physical distress, saying, "I did not refuse to cuff up." *See id.* Plaintiff is then seen being fingerprinted, again in no apparent physical pain, eyes open. In addition to the video, the medical records show that Plaintiff suffered no injuries. Plaintiff's assertion that he has a lasting injury to his right thumb is unsupported by any evidence and is contradicted by video and medical records.

In short, in the court's opinion, no reasonable juror could find for Plaintiff on this record. Summary judgment is therefore mandated for Defendants.

IT IS THEREFORE ORDERED THAT:

1) Defendants' motion for summary judgment (d/e 230) is granted. The Clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff pursuant to Fed. R. Civ. P. 56. All pending motions are denied as moot, and this case is terminated.

2) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.

Entered this 19th Day of September, 2007.

s\Harold A. Baker

HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE